MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2013 ME 78
Docket:        Cum-12-229
Argued:        December 12, 2012
Decided:       September 10, 2013

Panel:         ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.*
Majority:      LEVY, SILVER, MEAD, GORMAN, AND JABAR, JJ.
Dissent:       ALEXANDER, J.

KAREN CALLAGHAN et al.

v.

CITY OF SOUTH PORTLAND


MEAD, J.

[¶1]  Karen Callaghan and Burton Edwards (the employees) are part-time employees of the City of South Portland.  They filed a complaint in the Superior Court (Cumberland County) pursuant to 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-22) seeking a declaration that certain provisions of the City's personnel policy violated their First Amendment rights, and further seeking permanent injunctive relief from the enforcement of those provisions.  They then moved for summary judgment.

[¶2]  The City appeals from the entry by the court (*Warren, J.*) of a partial summary judgment for the employees and a corresponding permanent injunction barring the City from enforcing a prohibition on any City employee (1) seeking

---

* Saufley, C.J., sat at oral argument but did not participate in the development of the opinion.

election to or serving on the South Portland School Board; and (2) engaging in certain political activities on their own time, specifically circulating petitions or campaign literature in connection with School Board elections, and soliciting or receiving contributions or political service for or against candidates in School Board elections. Because we conclude that these provisions of the City's personnel policy violate these employees' First Amendment rights, we affirm the judgment as it applies to them. We vacate the judgment, however, to the extent that it invalidates the personnel policy as to City employees who are not parties to this action.

## I. BACKGROUND

[¶3] The facts are not disputed; accordingly, our task is to determine whether either party is entitled to a judgment as a matter of law. M.R. Civ. P. 56(c); *see Hayden-Tidd v. Cliff House & Motels, Inc.*, 2012 ME 111, ¶ 12, 52 A.3d 925 ("Summary judgment provides a procedural mechanism to test the application of law to facts that are not in dispute.").

[¶4] Since 2001, Karen Callaghan has been employed by the City as a part-time circulation librarian in the Library Department. Burton Edwards works for the City's Parks and Recreation Department about four hours per week on an as-needed basis. Both are subject to the City's personnel policy, which, following amendments in 2010 and November 2011, provides that City employees may not

(1) seek or accept nomination or election to any South Portland elective office (i.e., City Council or School Board) . . . ;

(2) use the influence of his or her employment capacity for or against any candidate for any City elective office;

(3) circulate petitions or campaign literature for any City elective office;

(4) solicit or receive subscriptions, contributions or political service from any person for or against any candidate for any City elective office; or

(5) use City facilities, equipment, materials or supplies to . . . assist or advocate for or against any candidate for any county, state, federal, or City elective office regardless of whether he or she is on or off duty.

[¶5]  In addition to her City employment, Callaghan has served on the South Portland School Board (Board) since 2007.  Before the City's personnel policy was amended in 2010, it permitted Callaghan's service on the Board, although City employees were barred from serving on the City Council.  When Callaghan sought reelection to the Board in 2011, she was advised by the City Clerk that because she had not resigned her City employment, the personnel policy amendments prevented the Clerk from placing her name on the ballot.  Following discussions with Callaghan's attorney, the City Manager advised Callaghan that he

would treat her candidacy as "grandfathered," "[f]or now."[1]  She subsequently ran unopposed, was reelected, and currently serves on the Board.

[¶6]  At some time before 2010, Edwards had served on the Board for eighteen years; some of that service coincided with his City employment.  In December 2010, Edwards expressed an interest in being appointed to fill an existing vacancy on the Board.  After the City Clerk questioned whether Edwards could be appointed given his City employment, Edwards decided not to pursue the appointment.  He asserts a continued interest in serving on the Board.

[¶7]  In September 2011, the employees filed a complaint pursuant to 42 U.S.C.A. § 1983,[2] asserting that the City's personnel policy was "an unconstitutional restraint on political speech" that violated the First Amendment to the United States Constitution.[3]  They also moved for a temporary restraining

---

[1]  Callaghan's one-time "grandfathering" was formalized in the November 2011 amendment to the personnel policy.  Pursuant to the current language, the City Manager would not have similar discretion should Callaghan again decide to run for reelection to the Board.

[2]  Title 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-22) provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The City is a "person" subject to suit for purposes of the statute.  *See Richards v. Town of Eliot*, 2001 ME 132, ¶ 38, 780 A.2d 281; *Polk v. Town of Lubec*, 2000 ME 152, ¶ 12, 756 A.2d 510; *Moen v. Town of Fairfield*, 1998 ME 135, ¶ 7 n.3, 713 A.2d 321.

order; that motion was denied because Callaghan's name was on the ballot, she was running unopposed, and the vacancy Edwards had expressed an interest in no longer existed.

[¶8] The employees moved for summary judgment and the City requested summary judgment in its favor. The court granted the employees' motion in part, permanently enjoining as unconstitutional the personnel policy's prohibitions against City employees (1) running for and serving on the Board, and (2) participating in Board elections by circulating petitions and campaign literature, soliciting contributions, and contributing political service on their own time. The court let stand provisions barring City employees from participating in Board elections by using the influence of their City jobs, using any City-owned facilities or property, or politicking during working hours. The court made it clear that its order applied only to the School Board, and not to elections involving the City Council or any other elective office. This appeal followed.

## II. DISCUSSION

### A. Nature of the Employees' First Amendment Interest

[¶9] The employees seek to participate in two activities that implicate the First Amendment: (1) serving on the Board; and (2) circulating petitions and

---

[3] The employees did not, and do not now, assert a separate violation of article I, section 4 of the Maine Constitution.

engaging in other campaign-related activities, either for themselves or for other candidates. Identifying the precise degree of constitutional protection those activities enjoy is not an easy task. The Eleventh Circuit has noted that "[p]recedent in the area of constitutional protection for candidacy can be best described as a legal morass." *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010); *see Matters v. Estes*, No. 1:13:-cv-578, 2013 WL 2403663, at *3 (N.D.N.Y. May 31, 2013) ("The extent of a public employee's right to run for public office is not clearly established.").

[¶10] A plurality of the United States Supreme Court has stated that candidacy is not a fundamental right such that strict scrutiny is required before it may be restricted. *Clements v. Fashing*, 457 U.S. 957, 963 (1982) (plurality opinion); *see Carver v. Dennis*, 104 F.3d 847, 850-51 (6th Cir. 1997) ("[T]he [Supreme] Court has never recognized a fundamental right to express one's political views through candidacy.").

[¶11] That said, although candidacy is not a fundamental right, it is clear that candidacy and related political activities are matters of significant constitutional import. *See Clements*, 457 U.S. at 977 n.2 (Brennan, J., dissenting) ("Although we have never defined candidacy as a fundamental right, we have clearly recognized that restrictions on candidacy impinge on First Amendment rights of candidates and voters."). The First Circuit has stated unequivocally that

"[c]andidacy is a First Amendment freedom," and therefore "the government may place limits on campaigning by public employees [only] if the limits substantially serve government interests that are important enough to outweigh the employees' First Amendment rights." *Magill v. Lynch*, 560 F.2d 22, 27, 29 (1st Cir. 1977) (quotation marks omitted). In *Randall*, the Eleventh Circuit noted that "[w]hile there is no fundamental status to candidacy requiring the rigorous standard of review that is applied in voters' rights cases, there is at least some constitutional right to candidacy"; accordingly, "restricting candidacy . . . must be the least restrictive means of furthering a vital government end. . . . Even though *Clements* does not make clear the degree of constitutional scrutiny required for candidacy restrictions, the [Supreme] Court does suggest that political candidacy is entitled to at least a modicum of constitutional protection." 610 F.3d at 711-12 (quotation marks omitted).

[¶12] The Supreme Court itself has recognized "the Constitution's special concern with threats to the right of citizens to participate in political affairs," *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2498 (2011) (quotation marks omitted), and has described "participation in political campaigns" as "close to the core of the First Amendment," *Waters v. Churchill*, 511 U.S. 661, 672 (1994). *See also Moen v. Town of Fairfield*, 1998 ME 135, ¶ 18, 713 A.2d 321 (noting the Supreme Court's recognition of "employees' fundamental

constitutional interest in supporting the political candidates of their choice").

Relevant to the employees' asserted right to be free to circulate petitions and campaign literature and to contribute political service on their own time during Board campaigns, the Supreme Court has said that "[p]etition circulation . . . is core political speech, because it involves interactive communication concerning political change. . . . First Amendment protection for such interaction . . . is [therefore] at its zenith." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186-87 (1999) (quotation marks omitted). *See Randall*, 610 F.3d at 711 ("Although being a candidate is not the same as supporting a candidate, the two acts are closely related.").

> [¶13] In sum,
>
> [a] plaintiff's candidacy cannot be burdened because a state official wishes to discourage that candidacy without a whisper of valid state interest. An interest in candidacy, and expression of political views without interference from state officials who wish to discourage that interest and expression, lies at the core of values protected by the First Amendment.

*Id.* at 713. In terms of applying those values and thereby deciding which of the competing interests must prevail in this case between the employees and the City, we are left in the same position in which the First Circuit found itself thirty-six years ago:

> What we are obligated to do in this case . . . is to apply the [Supreme] Court's interest balancing approach to the kind of nonpartisan election

revealed in this record. . . . We cannot be more precise than . . . characterizing the Court's approach as "some sort of balancing process." It appears that the government may place limits on campaigning by public employees if the limits substantially serve government interests that are important enough to outweigh the employees' First Amendment rights.

*Magill*, 560 F.2d at 27 (citation and additional quotation marks omitted).

## B. The Applicable Test

[¶14] Like the constitutional interests to be protected, the contours of the balancing test we are to apply are not precisely defined. Nevertheless, as Justice Breyer recently noted:

> Regardless of the label [used to describe the standard of review], some . . . approach is necessary if the First Amendment is to offer proper protection in the many instances in which a statute adversely affects constitutionally protected interests but warrants neither near-automatic condemnation (as "strict scrutiny" implies) nor near-automatic approval (as is implicit in "rational basis" review).

*United States v. Alvarez*, 132 S. Ct. 2537, 2552 (2012) (Breyer, J., concurring in the judgment). The Supreme Court has articulated two similar tests that may be employed to balance the important First Amendment rights of prospective candidates and the electorate against the significant interest of the State in maintaining the efficient and trustworthy operation of government.

### 1. The *Pickering* test

[¶15] In *Pickering v. Board of Education*, the Supreme Court rejected the notion that the government acting in its role as an employer may impose unlimited

restrictions on its employees' First Amendment rights, at the same time recognizing that the government may lawfully impose some restrictions on employee speech that would be unlawful if imposed on citizens who are not government employees. 391 U.S. 563, 568 (1968); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995) [hereinafter *NTEU*] ("In *Pickering* and a number of other cases we have recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large."); *Waters*, 511 U.S. at 671 ("[T]he government as employer indeed has far broader powers than does the government as sovereign.").

[¶16] *Pickering* announced a balancing test for analyzing public employees' First Amendment claims, which the Supreme Court has consistently employed in subsequent cases: "The problem in any case is to arrive at a balance between the interests of the . . . citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568. *See also NTEU*, 513 U.S. at 465-66; *id.* at 480 (O'Connor, J., concurring in the judgment in part) ("The time-tested *Pickering* balance . . . provides the governing framework for analysis of all manner of restrictions on speech by the government as employer.");

*Waters*, 511 U.S. at 668; *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *Connick v. Myers*, 461 U.S. 138, 142 (1983).

[¶17]  Accordingly, when, as here,

> a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern. . . . Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged.  Courts balance the First Amendment interest of the employee against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."   This framework reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission.

*Borough of Duryea, Pa.*, 131 S. Ct. at 2493 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (citation and additional quotation marks omitted).

[¶18]  Whether an employee's speech in a particular case involves a matter of public concern and, if so, whether the governmental employer can demonstrate that its interest outweighs the employee's interest in engaging in that speech, are each questions of law reviewed de novo.  *Moen*, 1998 ME 135, ¶¶ 14-15, 713 A.2d 321.  "[T]he balance we must strike . . . is driven entirely by the individual facts of th[e] case . . . consider[ing] the *importance* of the public speech at issue . . . ."  *Id.* ¶ 23; *see also Andrews v. Dep't of Envtl. Prot.*, 1998 ME 198, ¶ 15, 716 A.2d 212 (noting that "the degree of First Amendment protection afforded by *Pickering* depends upon [a] fact-based balancing test").

2.      The *Anderson* test

[¶19]   In contrast to *Pickering*, which focused on the First Amendment rights of government employees to speak on matters of public concern, in *Anderson v. Celebrezze* the Supreme Court examined the First Amendment rights of voters to have candidates for whom they might wish to vote appear on the ballot.  460 U.S. 780, 786, 806 (1983).  The Court first observed that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights."  *Id.* at 786.  To weigh those rights against the government's interest in elections that are "fair and honest and [accompanied by] some sort of order, rather than chaos," *id.* at 788 (quotation marks omitted), the Court articulated a balancing test that is very similar to, and no more definitive than, the balancing test it set out in *Pickering*:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.  The results of this evaluation will not be automatic; as we have recognized, there is no substitute for the hard judgments that must be made.

*Id.* at 789 (citation and quotation marks omitted).

[¶20]  This test, like the *Pickering* test, requires a reviewing court to (1) identify the First Amendment interest asserted by the employee/citizen and the magnitude of that interest; (2) identify the government's interest in restricting the First Amendment interest at issue, the strength of the justification for the restriction, and the extent to which the restriction is necessary to vindicate the government's interest; and then (3) balance factors (1) and (2) in making a determination as to which outweighs the other given the facts of a particular case.

3.    Hatch Act concerns

[¶21]  Before proceeding to an application of these balancing tests to the facts of this case, we take note of, and find to be unpersuasive, the City's argument that this case should be viewed as a straightforward Hatch Act case and resolved as such.  In general, the federal Hatch Act, 5 U.S.C.A. §§ 7321-7326 (West, Westlaw through P.L. 113-22), and its Maine counterpart, 5 M.R.S. § 7056-A (2012), prohibit certain political activity by covered government employees.  The City argues that because the Supreme Court has upheld some restrictions on government employee political activity under the Hatch Act, the restrictions at issue here are per se constitutional.  Even in cases where the Hatch Act is discussed, however, the Supreme Court has noted the applicability of the *Pickering* test when First Amendment rights are at issue.  *See NTEU*, 513 U.S. at 467; *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564

(1973) (applying *Pickering* test to limitations on partisan activity imposed by Hatch Act).

[¶22]  In any event, the Hatch Act as construed by the Supreme Court, and 5 M.R.S. § 7056-A by its explicit terms, apply to *partisan* political activity. *See NTEU*, 513 U.S. at 470-71; *Broadrick v. Oklahoma*, 413 U.S. 601, 606, 616-17 (1973); *Nat'l Ass'n of Letter Carriers*, 413 U.S. at 556; *see also Blaylock v. U.S. Merit Sys. Prot. Bd.*, 851 F.2d 1348, 1351-54 (11th Cir. 1988) (explaining Hatch Act's focus on partisan activity).  For example, the Maine equivalent of the Hatch Act explicitly allows state employees to run as "a candidate for public office in a nonpartisan election," 5 M.R.S. § 7056-A(6)(D), and even as a candidate in a partisan election for a local office, *id.* § 7056-A(4).  Elections to the South Portland School Board are nonpartisan.  Accordingly, Hatch Act philosophical concerns for efficient, corruption-free government are helpful here to the extent that they inform the governmental interest side of the balancing ledger, but they are not independently determinative of the analysis in this matter.

C.    Application of the *Pickering* and *Anderson* Tests to These Facts

[¶23]  Initially, we conclude that it is not necessary for us to choose either the *Pickering* test or the *Anderson* test to the exclusion of the other because the First Amendment interests asserted by the employees prevail under either test.  On

the facts of this case, satisfying *Pickering* necessarily satisfies the similar requirements of *Anderson*.

[¶24] The first part of the *Pickering* test requires the employees to show that their right to run for election to the Board and to engage in political activity in regard to Board elections is speech involving a matter of public concern. *See Moen*, 1998 ME 135, ¶ 14, 713 A.2d 321. The employees have met their burden here. By offering themselves as candidates for service on the Board, they seek to communicate to the electorate their positions on issues concerning South Portland schools and their ideas for improving the community's school system. *See Connick*, 461 U.S. at 145 ("[T]he Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (quotation marks omitted)). Such communication "fall[s] within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace."[4] *NTEU*, 513 U.S. at 466. From the community's perspective, the selection of members of the community to serve on the Board is unquestionably a matter of public concern. Finally, as we have

---

[4] The *Pickering* test does not apply when a government employee speaks "as an employee upon matters only of personal interest" rather than "as a citizen upon matters of public concern." *United States v. Nat'l Treasury Emp. Union*, 513 U.S. 454, 466 (1995) (quotation marks omitted). For example, "private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer." *Id.*

discussed, candidacy for office is subject to some measure of First Amendment protection.

[¶25]  The employees having satisfied their burden on the first prong of the test, the burden then shifts to the City to demonstrate that "its interest, as an employer, in providing efficient public services outweighs the employee[s'] interest[s]." *Moen*, 1998 ME 135, ¶ 14, 713 A.2d 321.  The Supreme Court has recognized that precisely describing that burden is difficult because it varies with the facts in every case:

> Pickering unmistakably states . . . that the State's burden . . . varies depending upon the nature of the employee's expression.  Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests.
>
> . . . .
>
> Because of the enormous variety of fact situations . . . we do not deem it either appropriate or feasible to attempt to lay down a general standard . . . .

*Connick*, 461 U.S. at 150, 154 (quotation marks omitted); *see Moen*, 1998 ME 135, ¶ 23, 713 A.2d 321 ("the balance . . . is driven entirely by the individual facts of th[e] case").

[¶26]  In this case the magnitude of the City's intrusion on the employees' interests in participating in the School Board electoral process—interests that lie "close to the core of the First Amendment," *Waters*, 511 U.S. at 672—is high.  As

a result, the City's burden of justification to show that its interests as an employer outweigh the employees' interests is correspondingly high. *See NTEU*, 513 U.S. at 483 (O'Connor, J., concurring in the judgment in part) ("As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification."); *In re R.M.J.*, 455 U.S. 191, 203 (1982) (stating that in order to regulate nonmisleading commercial speech, "the State must assert a substantial interest and the interference with speech must be in proportion to the interest served"); *Moen*, 1998 ME 135, ¶ 23, 713 A.2d 321 (stating that the *Pickering* analysis requires consideration of "the *importance* of the public speech at issue").

[¶27] Furthermore, "unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens." *NTEU*, 413 U.S. at 468. The City's personnel policy chills the employees' prospective candidacy for the Board and potential participation in Board campaigns, activity implicating the First Amendment, by raising the specter of an adverse employment action should they engage in it. Accordingly, "the [City's] burden is greater with respect to this . . . restriction on expression than with respect to an isolated disciplinary action." *Id.*

[¶28] Taking these principles into account, the City must demonstrate that the interests of both (1) the employees, and (2) the citizens of South Portland who may want the employees to represent them on the Board, or who may want a candidate to serve that would benefit from the employees' active support, "are

outweighed by that expression's *necessary impact* on the *actual operation* of the Government." *Id.* (emphasis added) (quotation marks omitted).  Although it has a significant burden, the City's interest is not negligible, as the Supreme Court has recognized: "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, 511 U.S. at 675.  "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin*, 483 U.S. at 388.  Accordingly, we are mindful that "[t]he *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150.

[¶29]  Against this legal backdrop we turn to the ultimate question: whether, on these facts, the City demonstrated a "necessary impact on the actual operation of the Government," *NTEU*, 513 U.S. at 468 (quotation marks omitted), sufficient to outweigh the employees' demonstrably strong First Amendment interest in running for election to the Board or actively participating on their own time in Board campaigns.  We conclude that the Superior Court correctly found that the City has not met that burden because it failed to demonstrate that these employees'

Board-related political activities would have an *actual* impact on municipal government operations, as opposed to a speculative or theoretical impact.

[¶30]   The City's justification for the personnel policy's restrictions is grounded wholly within the affidavits submitted by the City, principally the affidavit of James Gailey, the South Portland City Manager.   His affidavit describes the interaction between the city operations side of South Portland government, headed by the City Manager, and the school department, headed by the Board.   In sum, Gailey avers that (1) the Board manages the schools, submits an annual budget to the City Council for approval, and must have its debt addressed by the Council; (2) the City Manager has occasional contact with members of the Board about school-related issues; (3) the Board furnishes budget estimates to the Manager, and other reports when requested; and (4) some functions and costs are shared by the city operations side of municipal government and the school department, such as insurance, annual independent auditing, payroll software, the purchase of bulk commodities, utilities, and increasingly consolidated information technology departments.

[¶31]   Nowhere does Gailey's affidavit assert that he has any disciplinary authority over or direct influence on members of the Board as such, nor does it recite that a member of the Board has any authority over him or any other employee on the city operations side of South Portland government.   The affidavit

sets out a list of laudable goals for municipal government that Gailey proffers as justification for the personnel policy at issue,[5] but it does not establish how any of these goals is actually hindered by the service of a part-time librarian or part-time parks and recreation worker on the Board. To the contrary, despite Callaghan's and Edwards's service on the Board for a total of twenty-three years, the City offers no instance, or even a suggestion of an instance, where their membership on the Board and simultaneous employment in another City department created any actual difficulty or interference with the goals for municipal government that Gailey identifies. Furthermore, the affidavit does not cite a single instance of any adverse impact on the operation of City government occurring as a result of any City employee serving on the Board in the years before 2010, years when such service was not prohibited by the personnel policy.

[¶32] Some of the most serious evils postulated in Gailey's affidavit, for example an employee "using [his] employment status with the City, or City work time, to influence local elections"; "using 'company time' to collect petition

---

[5] In part, Gailey avers that

[w]ith regard to . . . the "political activity" provision of the Personnel Policy, there are a number of reasons why I want this provision in the Personnel Policy. I want there to be efficient and effective municipal government operations; I want a municipal government that enjoys public confidence; I want individual citizens to be free of municipal governmental discrimination based on their political activities or connections; I want municipal government employees to be free of employer pressure in their personal political decisions; and I want to prevent a situation where a subordinate employee runs against a supervisor.

signatures for local elections or e-mail[ing] fellow employees or members of the general public about local elections"; or engaging in politicking "to influence fellow employees or members of the general public with whom they come into contact as part of their employment"; remain prohibited by the portions of the personnel policy affirmed by the Superior Court, meaning that if an employee engaged in those activities, he or she would still be subject to discipline. Another justification asserted by the Gailey affidavit that would be of serious concern if actually present, namely "prevent[ing] a situation where a subordinate employee runs against a supervisor," cannot occur here because the ban on City employees running for City Council remains in place, and the School Board has no supervisory authority over City employees.[6] In sum, the core threats to municipal administration identified by Gailey are not presented in any fashion by Callaghan and Edwards serving on the School Board.

[¶33]  Viewing the facts objectively, following the Superior Court's judgment the City retains effective weapons in its personnel policy to neutralize what it terms the "viper in the nest"—thus far purely theoretical—that it fears. The most concrete impact on the actual operation of City government demonstrated by Gailey's affidavit is his assertion that it would "likely be awkward" if he were

---

[6]  Nor could a school department employee run for election to the Board and thereby gain authority over his or her supervisor; that possibility is foreclosed by statute. *See* 20-A M.R.S. § 1002(2) (2012).

involved in a disciplinary action against a City employee who also served on the Board, or "would be awkward" if he requested budget estimates or reports from the Board if a member was also a City employee. As the trial court concluded, it might be personally uncomfortable if the City Manager was in a position to discipline a Board member for some incident that occurred in the course of his or her City employment, but the Manager's personal discomfort falls far short of the strong showing of a necessary impact on the actual operation of City government required under the *Pickering* analysis before these City employees' First Amendment rights may be restricted.[7]

[¶34] Because, on the facts of this case, and with specific regard to School Board elections and these employees, the City has not "demonstrated that its interest, as an employer, in providing efficient public services outweighs the employee's interest, as a citizen, in commenting on a matter of public concern," *Moen*, 1998 ME 135, ¶ 14, 713 A.2d 321, the Superior Court correctly found that the personnel policy's prohibitions on these two employees running for election to the Board or actively participating in Board elections on their own time violate the First Amendment.[8]

---

[7] Why it would be awkward for the City Manager to request routine budget information from the Board if one or more of its members was also a City employee is, as the Superior Court also concluded, not apparent.

D.   Remedy

[¶35]   The court went beyond the unique circumstances of these two employees, however, and enjoined the policy's enforcement against all City employees.   We do not think it necessary or advisable to do so in this case, choosing instead to follow the Supreme Court's prudent advice that "although the occasional case requires us to entertain a facial challenge . . . we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants."[9]   *NTEU*, 513 U.S. at 477-78.

[¶36]   At oral argument, the employees conceded that the City could lawfully prohibit some City employees from running for the Board, for example the City Manager himself and perhaps supervisors or those employees with direct input into the City's budgetary process, but they offered no principled dividing line to separate employees who could lawfully be barred from running from those who could not.   We decline to usurp the role of City officials in drawing that line

---

[8]   We remain true to our rule that "[o]rdinances are presumed constitutional."  *Fitanides v. City of Saco*, 2004 ME 32, ¶ 10, 843 A.2d 8.  Callaghan and Edwards met their initial burden to show that the personnel policy restricted their efforts to speak on matters of public concern.  If they had not met that burden, the policy's presumption of constitutionality would remain, and the City would prevail.  *See id.* ¶ 14.  Thus we have done what the dissent contends we failed to do, which is to "initially presume that the ordinance is constitutional."  Dissenting Opinion ¶ 50.

[9]   Positive relief is required for these plaintiffs, however, because the factual record is complete.  The parties had a full opportunity to present facts at the summary judgment level, and the facts they presented were essentially uncontroverted.  Thus, there is no reason for us to simply remand this matter to the trial court for further fact-finding.

beyond fulfilling our responsibility to say that under the factual circumstances of this case, these two employees could not, consistent with the First Amendment, be prohibited from running or participating in Board elections. Although a blanket prohibition would doubtless be easier for the City to enforce, here it overreaches, and our "acknowledging the difficulty of rendering a concise formulation, or recognizing the possibility of borderline cases, does not disable us from identifying cases far from any troublesome border." *Brown v. Hartlage*, 456 U.S. 45, 56 (1982). That said, it is best left to City officials more intimately familiar with the inner workings of South Portland municipal government than we to promulgate a policy that both promotes efficient government and does not offend the First Amendment rights of its employees.

The entry is:

> As to these plaintiffs, judgment affirmed. As to other City of South Portland employees, judgment vacated. Remanded for further proceedings consistent with this opinion.

―――――――――――――

ALEXANDER, J., dissenting.

[¶37] Today the Court holds that the First Amendment to the United States Constitution may, if a judge agrees, be applied to bar municipalities from prohibiting their employees from being a candidate to hold a second position in the

same municipality that may create a conflict of interest between the employee's obligations as a political employee in one position and the employee's obligations as a nonpolitical employee in the other position. From that holding, I respectfully dissent.

[¶38] The Court has comprehensively addressed the federal and state precedents on federal, state, and local government employees' rights to freedom of expression and the extent to which government may, as a condition of employment, limit those rights by prohibiting those who already hold one office from seeking and holding a second office with the same government entity. The Court correctly observes, citing a recent Eleventh Circuit opinion, that the issue of constitutional protections for a government employee seeking to become a candidate for a second government office is a "legal morass." Court's Opinion ¶ 9. *See Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010) ("Precedent in the area of constitutional protection for candidacy can be best described as a legal morass."); *Matters v. Estes*, 2013 WL 2403663, at *3 (N.D.N.Y. May 31, 2013) ("The extent of a public employee's right to run for public office is not clearly established.").

[¶39] Unfortunately, after recognizing that the issue of constitutional protections for a public employee's candidacy for a second office is a "legal morass," Court's Opinion ¶ 9, the Court then analyzes the issue as if it were a public employees free speech case, such as *United States v. Nat'l Treasury Emps.*

*Union*, 513 U.S. 454 (1995), and *In re R.M.J.*, 455 U.S. 191 (1982), subjecting the candidacy restrictions to something like the strict-scrutiny analysis that is applied to speech restrictions to shift to the City the burden of justifying its prohibitions on city employees seeking one city office while they hold another city office. Court's Opinion ¶¶ 23-34.

[¶40] The only legal issue to be adjudicated is the plaintiffs' 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-22) claim that the First Amendment to the United States Constitution is violated by the City's prohibition on employees holding nonpolitical positions in City government from becoming a candidate for a political position in City government. Accordingly, we may look to First Amendment precedent addressing similar restrictions imposed on state and federal employees to evaluate the validity of the restrictions in this case.

[¶41] Applying those precedents, the Court generally vacates the trial court's injunction barring the City from enforcing its prohibition of its nonpolitical employees from seeking and holding a second, political office in the City. In support of generally vacating the injunction, the Court notes that although the employees agreed that the City could prohibit some employees from running for the School Board or other elective City offices, the employees "offered no principled dividing line to separate employees who could lawfully be barred from running from those who could not." Court's Opinion ¶ 36.

[¶42]   But then the Court purports to divine the dividing line that the employees themselves failed to identify and decides that the prohibition on employees seeking and holding two offices, proper as to all other City employees, is somehow improper as to the two employee-plaintiffs.  Rather than establishing a specific rule of law to provide reasoned guidance to state and local governments, and their employees, on whether an employee holding one office may retain that office while seeking and holding another office within the same governmental unit, the Court leaves the issue to an after-the-fact decision by a court—a decision upon which two judicial fact-finders could reach different results, and a decision that likely would not be final until long after the election in which an individual sought to be a candidate.  *See* Court's Opinion ¶ 36.

[¶43]   Holding that this important issue of municipal governance—whether municipal employees, in the face of a municipal policy prohibiting it, may seek and hold two municipal offices at once—is a factual decision left to a court in each instance, fails to provide the guidance that appellate courts should provide in addressing important public policy questions.

[¶44]   If this case were about plaintiffs' nonpartisan pamphleteering at the Maine Mall, or running for the School Board in Scarborough, on the employee's free time, of course, I would agree with the Court that the City could not prevent such activity by its employees.  But this case is about a municipality's capacity to

prevent each of its employees from engaging, on City time, in a blatant conflict of interest between the City department, employing the employee and another City department, the most expensive department in City government, in which the employee seeks to be the master.

[¶45]  The State properly prohibits its classified employees from running for or serving in the Maine Legislature, preventing conflicts between the budgeting, policy, and priority setting interests of the two positions.  *See* 5 M.R.S. § 7056-A(3) (2012).  The State properly prohibits its classified employees from advocating before the Legislature for the interests of, or contracting with, themselves or any entity which may result in a benefit to themselves or any entity in which they have a substantial financial interest.  5 M.R.S. §§ 18, 18-A (2012). These restrictions are important to preserving both the appearance and the reality of integrity in State government operations.  To promote both the appearance and the reality of integrity in City government operations, the City can impose similar requirements on its nonpolitical, classified employees.

[¶46]  Karen Callaghan is an employee of the Library Department.  The Library Department's budget needs and priorities directly compete with and are affected by budgeting decisions and priorities that may be demanded by the School Board.  Further, the Library Department's and the School Board's interests may conflict on issues such as intellectual property acquisitions and access, use of one's

facilities by the other, and the role of the educational services provided by each in the community.

[¶47]    Burton Edwards is an employee of the Parks and Recreation Department.[10]  The Parks and Recreation Department's budget needs and priorities directly compete with and are affected by budgeting decisions and priorities that may be demanded by the School Board.  In addition, the Parks and Recreation Department's and the School Board's interests may conflict on issues such as maintenance priorities (whose grass gets mowed first) and proper and joint uses of fields, playgrounds, tennis courts, and the like.

[¶48]  Further, the employees' status as department employees and School Board executives and legislators can create direct personal conflicts when considering collective bargaining agreements and employee discipline practices, and deciding issues such as the proper scope of and municipal contributions to employee benefits, health insurance, and retirement plans.    The issue of government contributions to employee health and retirement benefits is perhaps the most controversial and costly issue facing state and local governments today.  Any person who is an employee in one municipal department and an executive and

---

[10]   The Court's opinion indicates that Burton Edwards works for the City approximately four hours per week, but its reasoning applies equally to employees working four, or fourteen, or forty hours per week.  I agree that for a case such as this, the important freedom of expression and governmental integrity principles addressed by the Court should not be dependent on the number of hours per week a person works.

legislator in another municipal department is certain to have a conflict-of-interest and obligations whenever these issues have to be addressed.

[¶49]   The Court's opinion that the City cannot prevent these particular employees from seeking and holding two conflicting positions within City government is flawed in two significant ways.  First, it gives short shrift to the conflict of interest concerns addressed by the City policy, although adoption and enforcement of similar restrictions by the State and federal governments, acknowledged by the Court, demonstrate that such policies are indeed a legitimate governmental interest to be respected in constitutionality analysis.[11]  *See* Court's Opinion ¶ 32.

[¶50]   Second, despite acknowledging that there is no "fundamental constitutional right" to run for a second municipal office, and that the strict-scrutiny burden-shifting analysis does not apply, the Court fails to give the City's policy the benefit of the doubt to which it is entitled under our standards of review for constitutional claims made against municipal ordinances and policies implementing those ordinances.  *See* Court's Opinion ¶ 10.  When the constitutionality of a local ordinance is challenged, we have said that we will

---

[11]   The Court attempts to distinguish the well accepted prohibitions on State employees running for State elected offices by asserting that the State prohibitions are limited to partisan elections, but the State conflict of interest laws, 5 M.R.S. §§ 18, 18-A (2012), contain no such limitation.  They apply to all conflicts of interest, not just those that involve participation in partisan elections.  *See* 5 M.R.S. § 18-A(2).

initially presume that the ordinance is constitutional. *Fitanides v. City of Saco*, 2004 ME 32, ¶ 10, 843 A.2d 8. Accordingly, the challenger has the burden of proof to demonstrate that an ordinance is unconstitutional or is being applied in an unconstitutional manner. *Quiland, Inc. v. Wells Sanitary Dist.*, 2006 ME 113, ¶ 16, 905 A.2d 806.

[¶51] The Court's opinion places the burden on the City to justify its restrictions, but that is not where the burden should lie. Placing the burden on the City is directly contrary to our precedents stating that when the constitutionality of an ordinance is challenged, we initially presume that the ordinance is not violative of the Constitution until the plaintiff makes a case that the ordinance or government action implementing the ordinance is unconstitutional. *See Fitanides*, 2004 ME 32, ¶ 10, 843 A.2d 8.

[¶52] The Court has acknowledged that the City could impose its restrictions on the City's other classified employees, and can bar all its classified employees from running for the City Council. Because there is no rational basis for distinguishing between treatment of candidacy for the City Council and candidacy for the School Board, which controls the largest budget of any City agency, I would hold that the plaintiffs have failed to meet their burden of demonstrating that the City restriction does not protect a legitimate governmental interest.

[¶53] The constitutional propriety of restricting municipal employees from holding two offices within the same municipality is established by the Court's opinion. With constitutional propriety established, the courts have no business getting into the minutiae of examining whether this legitimate restriction should be applied to candidacy of particular employees for the City Council or to the candidacy of some employees, but not other employees, for the School Board. There is no dispute about the facts here or about the serious conflicts of interest that would be created if, contrary to municipal policy, employees of municipal departments are permitted to run for the School Board. Accordingly, I would vacate the judgment of the Superior Court, and remand with direction to deny the plaintiffs' claims for relief.

---

**On the briefs:**

Sally J. Daggett, Esq., and Mark A. Bower, Esq., Jensen Baird Gardner & Henry, Portland, for appellant City of South Portland

David A. Lourie, Esq., Portland, for appellees Karen Callaghan and Burton Edwards

Zachary L. Heiden, Esq., American Civil Liberties Union of Maine Foundation, Portland, for amicus curiae American Civil Liberties Union of Maine Foundation

**At oral argument:**

Sally J. Daggett, Esq., for appellant City of South Portland

David A. Lourie, Esq., for appellees Karen Callaghan and Burton Edwards

Cumberland County Superior Court docket number CV-2011-428
FOR CLERK REFERENCE ONLY